## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

| | |
|---|---|
| Settling Devotional Claimants ) | |
| ) | |
| Appellant, ) | Case No. 15-1084 |
| v. ) | |
| ) | consolidated with |
| The Librarian of Congress and ) | |
| Copyright Royalty Board ) | Case No. 15-1093 |
| ) | |
| Appellees. ) | |
| _____ ) | |
| ) | |
| Worldwide Subsidy Group, LLC dba ) | |
| Independent Producers Group, ) | |
| ) | |
| Intervenor. ) | |
| _____ ) | |

**APPEAL OF INDEPENDENT PRODUCERS GROUP FROM RULINGS OF THE LIBRARIAN OF CONGRESS AND COPYRIGHT ROYALTY BOARD**

**APPELLANT'S BRIEF**

Brian D. Boydston, Esq.
Pick & Boydston, LLP
10786 Le Conte Ave.
Los Angeles, CA  90024

(213)624-1996
brianb@ix.netcom.com

Counsel for Appellant Independent Producers Group

## <u>CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES</u>

**Parties.** The undersigned represents Worldwide Subsidy Group, LLC, doing business as Independent Producers Group ("IPG"), Appellant in this matter, and no other party. Appellees are the Librarian of Congress and the Copyright Royalty Board ("CRB"). Appellees are The Christian Broadcasting Network, Inc., Coral Ridge Ministries Media, Inc., Crystal Cathedral Ministries, Inc., In Touch Ministries, Inc., and Oral Roberts Evangelistic Association, Inc. (collectively, the "Settling Devotional Claimants" or "SDC").

**Rulings.** IPG appeals the orders of the CRB dated May 2, 2014, June 18, 2014, and January 14, 2015 (published at 80 Fed. Reg. 13423), regarding IPG's claims in the "Devotional" category of Docket No. 2008-1 CRB CD 98-99 (Phase II) on the grounds that the CRB violated 5 U.S.C. § 706 and the decisional law thereunder by issuing an order that, among other things was arbitrary, transgressed unequivocal statutory commands, was not in accordance with law and was unwarranted by the facts to the extent that the facts are subject to trial *de novo* by the reviewing court.

**Related Cases.**  There are no related cases.

Respectfully submitted,

Dated February 19, 2016              _____/s/_____

Brian D. Boydston, Esq.

PICK & BOYDSTON, LLP

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1 of the U.S. Court of Appeals for the D.C. Circuit, Intervenor Worldwide Subsidy Group, LLC dba Independent Producers Group hereby asserts that there is no parent corporation or publicly held corporation holding 10% or greater ownership interest in Intervenor.

Intervenor is a claimant or agent of claimants of cable retransmission royalties distributed by the Copyright Royalty Board pursuant to 17 U.S.C. § 803.

## TABLE OF CONTENTS

**TABLE OF CONTENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

**JURISDICTIONAL STATEMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

**STATEMENT OF ISSUES PRESENTED FOR REVIEW** . . . . . . . . . . . . . . **10**

**STATEMENT OF THE CASE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

**STATEMENT OF FACTS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

**SUMMARY OF THE ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**

**ARGUMENT**

     **A. THE CRB ERRED BY DISMISSING THE CLAIM OF**
       **ADVENTIST MEDIA CENTER, INC.** . . . . . . . . . . . . . . . . . . . . . . **15**

     **B. THE CRB ERRED BY RELYING ON THE RESULTS OF A**
       **STUDY FOR WHICH THE UNDERLYING EVIDENTIARY**
       **SUPPORT WAS NOT PRODUCED IN DISCOVERY, WAS NOT**
       **EXISTENT AND FOR WHICH THERE WAS NO SPONSORING**
       **WITNESS AS TO DESIGN.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**

         **1. THE REGULATORY REQUIREMENTS FOR**
          **INTRODUCTION INTO EVIDENCE OF A STUDY OR**
          **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

         **2. THE SDC'S DISCOVERY VIOLATION, AND IPG'S MOTION**
          **TO STRIKE PORTIONS OF THE SDC WRITTEN DIRECT**
          **STATEMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

         **3. IPG'S MOTION IN LIMINE** . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**

**C. THE CRB TRANSGRESSED UNEQUIVOCAL STATUTORY COMMANDS BY ADOPTING THE PURPORTED CONCLUSIONS OF A VIEWER-BASED STUDY** . . . . . . . . . . . . . 32

**D. THE CRB TRANSGRESSED UNEQUIVOCAL STATUTORY COMMANDS BY ADOPTING THE PURPORTED CONCLUSIONS OF A STUDY THAT HAD AN INADEQUATE NUMBER OF SAMPLED STATIONS** . . . . . . . . . . . . . . . . . . . . . . . 37

**E. THE CRB ERRED IN ITS APPRAISAL OF THE IPG DISTRIBUTION METHODOLOGY BY MISSTATING IPG'S EVIDENCE AND ITS SIGNIFICANCE, MISSTATING DR. ROBINSON'S STUDY DESIGN, AND APPLYING UNSUBSTANTIATED CRITICISMS NOT SIMILARLY APPLIED TO THE SDC METHODOLOGY** . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**1. DESCRIPTION OF THE IPG METHODOLOGY**. . . . . . . . . . 38

**2. THE IPG METHODOLOGY RESULTS ACCORDING TO THE MEASURED METRICS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**3. CRB CRITICISMS OF THE IPG METHODOLOGY**. . . . . . . . 42

**a. DR. ROBINSON'S ALLEGEDLY INACCURATE PRESUMPTION REGARDING THE MARKET TO MEASURE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

**b. DR. ROBINSON'S ALLEGED "INDIRECT" RELIANCE ON VIEWERSHIP**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

**c. THE ALLEGED "STRAITJACKETING" OF DR. ROBINSON**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

**d. DR. ROBINSON'S STATION SAMPLE**. . . . . . . . . . . . . 47

**e. CRITICISM OF THE METRICS SELECTED BY DR. ROBINSON**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

**4. THE CRB'S RESULT-ORIENTED DETERMINATION**. . . . . 55

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **56**

**CERTIFICATE OF COMPLIANCE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **59**

# TABLE OF AUTHORITIES

**Federal Statutes:**                                                    Page(s)

17 U.S.C. § 111(c)(3)……………………………………………………42, 43

17 U.S.C. § 111(d)(1)(B) …………………………………………………42

17 U.S.C. § 803(a)(1) ……………………………………………..………32

17 U.S.C. § 803(d) ………………………………………………..………..9

**Federal Regulations:**

37 C.F.R. §351.6…………………………………………………..………19

37 C.F.R. § 351.10(a) ……………………………………………..………16

37 C.F.R. §351.10(e) …………………………………………………19, 26, 29, 31

37 C.F.R. §351.10 (f) ……………………………………………………19, 26, 29

**Federal Register Citations:**

57 Fed. Reg. 15286 (April 27, 1992) …………………………………………34, 46

66 Fed. Reg. 66433 (Dec. 26, 2001) …………………………………………...46

69 Fed.Reg. 3606 (Jan. 26, 2004) …………………………33, 36, 44, 45, 53, 54

75 Fed. Reg. 26798 (May 12, 2010) …………………………………………...46

75 Fed. Reg. 57063 (Sept. 17, 2010) …………………………………… 33, 46, 54

78 Fed. Reg. 64984 (Oct. 30, 2013) …………………………………………….. 34

## JURISDICTIONAL STATEMENT

Intervenor Worldwide Subsidy Group LLC dba Independent Producers Group appeals from the final orders of the Copyright Royalty Board dated May 2, 2014, June 18, 2014, and January 14, 2015. Intervenor timely filed its notice of Appeal on April 13, 2015, pursuant to 17 U.S.C. § 803(d).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

**Determinations regarding the Validity of IPG claims:**

1. Whether the CRB erred by dismissing the claims of Adventist Media Center Productions.

**Determinations regarding the Validity of the SDC Methodology:**

2. Whether the CRB erred by relying on the ostensible results of a distribution methodology study for which the underlying evidentiary support was not produced in discovery, was not existent, was imperfectly re-created after the close of discovery and therefore not subject to discovery, and for which there were no sponsoring witnesses to attest as to either the construction of the study or the elements of data contained therein.

3. Whether the CRB erred by relying on conclusions ostensibly derived from a study that equated Nielsen-measured household viewing to the measure of "value" for any program retransmitted by a cable system, in contravention of prior rulings upon which the CRB was statutorily required to abide.

4. Whether the CRB erred by relying on conclusions ostensibly derived from a distribution methodology that relied on an inadequate number of sampled stations, in contravention of prior rulings upon which the CRB was statutorily required to abide.

**Determinations regarding the Validity of the IPG Methodology:**

5. Whether the CRB erred in its appraisal of the IPG-proposed distribution methodology by misstating IPG's presented evidence and the significance thereof, misstating the distribution methodology design, and applying criticisms to IPG's presented methodology that the CRB would not similarly apply to the SDC methodology.

## STATEMENT OF THE CASE

IPG hereby appeals the rulings of the CRB, dated May 2, 2014, June 18, 2014, and January 14, 2015,[1] as they relate to final distribution of 1999 cable royalties attributable to the devotional programming category.

## STATEMENT OF FACTS

IPG is a regular participant in the cable royalty distribution proceedings, pursuant to which IPG is granted the right to collect cable retransmission royalties for programming owned by various audiovisual copyright owners.  On February 28, 2008, IPG filed its Notice of Intent to Participate in Phase II distribution proceedings relating to the Devotional Programming category.  (Dkt. #1).  On July 25, 2013, the Copyright Royalty Judges issued their Order Setting Deadline for Filing Written Direct Statements, Announcing Discovery Period, and Requiring a Settlement Conference.  (Dkt. #78).  The CRB bifurcated the proceeding in order to have hearings on "claims only" issues, and then "allocation" issues.  (Dkt. ##108, 114, 144).

IPG indicated its representation of six (6) producers and distributors in the Devotional Programming category.  (Dkt. #101 at 6; see Ex. IPG-1).  IPG's only

---

[1]   The rulings were respectively entitled "Order Denying IPG Motion to Strike Portions of SDC Written Direct Statement" (Dkt. #147), "Ruling and Order Regarding Claims and Separate Opinion" (Dkt. #152), and "Final Determination of Distributions of 1999 Cable Royalty Funds (Phase II)" (Dkt. #195).

adversary was SDC, a consortium of five claimants making claim for 1999 devotional programming royalties.

Following a one-day hearing to address the consequences of a significant discovery matter raised by IPG, on May 2, 2014 the CRB issued an order denying IPG's motion to strike portions of the SDC written direct statement.  (Dkt. #147).

Following a two-day preliminary hearing on claims issues only, on June 18, 2014, the claim of IPG-represented claimant Adventist Media Center, Inc. was dismissed.  (Dkt. #152).

On January 14, 2015, the CRB issued its final distribution order.  The order first addressed IPG's pending motion *in limine* to exclude any evidence relating to the SDC viewer study, then provided substantial detail regarding the CRB's comparison of the SDC viewer study and IPG's proposed methodology.

Characteristic of all recent CRB rulings, particularly harsh language was used to describe the IPG-sponsored methodology, regardless of the fact that it was devised by an economist with the credentials of Dr. Laura Robinson.[2]  The criteria considered by Dr. Robinson are the same metrics considered by every foreign

---

[2]   Dr. Robinson obtained her Bachelor's degree in Economics from Harvard University, and subsequently obtained a Master's degree in Economics from Columbia University, then a Master's degree and Doctorate degree from Columbia Business School.  She is a Managing Director and Principal of Navigant Economics, with an extensive list of publications dating back two decades.  (Dkt. #80; CV of Dr. Robinson).

entity distributing retransmission royalties, but Dr. Robinson's use of such metrics was subject to numerous criticisms, and deemed untenable**.**   Subject to CRB precedent deeming viewer based models inappropriate, Dr. Robinson looked at data reflecting *CSO* decisionmaking.  On all discernible metrics, the comparison between the IPG and SDC programming was nearly an exact 50/50 split.

## SUMMARY OF ARGUMENT

The CRB erred by refusing to admit into evidence the sworn declaration of a representative of Adventist Media Center, Inc., and consequently dismissing its claim.

The CRB erred by relying on the results of a study for which the underlying evidentiary support was not produced in discovery, was not existent, and for which there was no sponsoring witness as to design.  Such study was inadmissible according to explicit regulations for which no basis for exception existed, and should have been excluded either pursuant to IPG's motion to strike portions of the SDC written direct statement, or IPG's motion *in limine*.

The CRB transgressed unequivocal statutory commands by adopting the purported conclusions of a viewer-based study.

The CRB transgressed unequivocal statutory commands by adopting the purported conclusions of a study with a statistically insufficient amount of data.

The CRB erred in its appraisal of the IPG distribution methodology by misstating IPG's evidence and its significance, misstating Dr. Robinson's study design, and applying unsubstantiated criticisms not similarly applied to the SDC methodology, all in order to reach a result-oriented conclusion.

## ARGUMENT

### A. THE CRB ERRED BY DISMISSING THE CLAIM OF ADVENTIST MEDIA CENTER, INC.

The SDC's challenge to IPG-represented claims was chock-full of inflammatory accusations that were rejected, however a challenge was posed to the claim of Adventist Media Center, Inc. ("Adventist") on more technical grounds. According to the SDC, IPG's filing of its claim for 1999 cable royalties misidentified such entity as "Adventist Media Center Productions", and further alleged that such entity "did not own the copyright" to the programs being claimed by it, "It Is Written", and "Breath of Life". (Dkt. #130 at pp. 12-13). According to the SDC, such programs are owned by "It Is Written, Inc." and "Breath of Life, Inc.", respectively.

In response, IPG submitted the declaration of Warren Judd. (Dkt. ##132, 141, Exh. IPG-P-026). Therein, Mr. Judd details that he is the Vice-President of *each of* Adventist Media Center, Inc., It Is Written, Inc., and Breath of Life, Inc., and explains the relationship between such separate legal entities. Mr. Judd's declaration explained that Adventist produces, distributes and controls the devotional programs "It is Written" and "Breath of Life", and while the copyright to each of the programs are initially recorded in the name of "It Is Written, Inc." and "Breath of Life, Inc.", "the specific and primary purposes of the organizations .

15

. . are clearly stated in the Articles of Organization for each entity".  Specifically,

Mr. Judd identified the following language within the Articles of Organization for

both It Is Written, Inc. and Breath of Life, Inc.:

> "The specific and primary purpose for which this corporation is
> formed is to engage in the solicitation, receipt, and administration of
> property, and from time to time *to disburse such property* and the
> income therefrom solely to, or for the benefit of Seventh-day
> Adventist Radio, Television and Film Center, a California nonprofit
> religious corporation [c/k/a Adventist Media Center, Inc.]."

(Dkt. ##132, 141, Exh. IPG-P-026 (emphasis added)).

Mr. Judd continues thereafter to explain that he exectued an agreement with

IPG on behalf of Adventist for representation in these proceedings, which

agreement expressly identifies "It Is Written" and "Breath of Life" as

programming "owned or controlled by [Adventist] for which [Adventist] retains

the right to collect cable and satellite retransmission royalties."  According to Mr.

Judd, "[s]uch representation was accurate at the time made, and remains accurate

at this time." (Dkt. ##132, 141, Exhs. IPG-P-026 and IPG-P-027).

Notwithstanding, the CRB refused to allow introduction of such declaration

solely on the grounds that it was "hearsay".  All declarations are hearsay evidence,

by definition.  Nevertheless, per CRB regulations, hearsay evidence may be

admitted.  37 C.F.R. §351.10(a).  Due to the fact that distribution proceedings

potentially address the claims of *thousands* of claimants, requiring each claimant to

appear at hearings and verify their ownership would be untenable.  Consequently,

claimant declarations attesting to a claimant's ownership and multiple other matters have been *regularly* accepted into evidence in royalty distribution proceedings.  No challenge was made that the Judd declaration was invalid, or suspect, and ironically, in the more recent proceedings relating to 1999-2009 satellite royalties, the CRB allowed into evidence *the identical declaration of Mr. Judd*. (2012-7 CRB SD 1999-2009, Dkt. #c201, Exh. IPG-P-051).  The CRB ruling begs the question as to whether every claimant whose claim is challenged (with or without good cause) must appear to testify in Washington, D.C. in order to preserve their claim, or at least demonstrates the inconsistent treatment of such issue by the CRB.

Without the aid of Mr. Judd's declaration, the CRB dismissed the claim of Adventist in these proceedings.  Explaining that it was not addressing the significance, if any, of the slight misnomer, the CRB held that Adventist does not "own the copyrights" to the programs claimed in this proceeding, and that "nothing in the record establishes Adventist Media Productions as a designated agent of the copyright owners for purposes of claiming retransmission royalties."  (Dkt. #152 at pp. 17-18).

It is technically correct that "nothing in the record" established the entitlement of Adventist, but only because the CRB erringly excluded Mr. Judd's

declaration.[3]  However, Mr. Judd's declaration should have been admitted into

evidence and considered.  Mr. Judd is an officer of *all* relevant entities possible of

being attributed "copyright ownership" or authorization to make claim in this

proceeding for the programs "It Is Written" and "Breath of Life", and he attested in

great specificity the basis for Adventist's status as an appropriate claimant.  No

evidence presented by the SDC contradicted Mr. Judd's declaration, and while Mr.

Judd directly addressed the authorization of Adventist to make claim for the

programs in issue, he further noted the articulation of that authority within publicly

available documents, i.e., the Articles of Organization for It Is Written, Inc. and

Breath of Life, Inc.  For the CRB to simply dismiss Mr. Judd's uncontroverted

declaration as offering "nothing" to establish Adventist as a valid claimant simply

defies reason.

For the foregoing reasons, the CRB erred by dismissing the claim of

Adventist, such determination was arbitrary and capricious, and this matter should

be remanded in order to accord a value to Adventist's claimed programming.

## B. THE CRB ERRED BY RELYING ON THE RESULTS OF A STUDY FOR WHICH THE UNDERLYING EVIDENTIARY SUPPORT WAS NOT PRODUCED IN DISCOVERY, WAS NOT EXISTENT, AND FOR WHICH THERE WAS NO SPONSORING WITNESS AS TO DESIGN.

---

[3]  Although the CRB excluded the declaration of Mr. Judd at the claims hearing,
its ruling nonetheless cited such declaration to support its description of the
fictitious names utilized by such entity.  (Dkt. #152 at p.17).

## 1. THE REGULATORY REQUIREMENTS FOR INTRODUCTION INTO EVIDENCE OF A STUDY OR ANALYSIS.

A notable fact regarding the retransmission royalty distribution proceedings is that discovery is significantly more circumscribed than in civil proceedings. Depositions, Interrogatories, Requests for Admissions, and Subpoenas are altogether non-existent. Parties are nevertheless entitled to receive requested documents that are "nonprivileged underlying documents related to the written exhibits and testimony" appearing in a party's written direct statement. 37 C.F.R. §351.6.

Such discovery parameters must further be read in light of the rules for admissibility of evidence and, particularly, the admission of studies:

> e) Introduction of studies and analyses. ***If studies or analyses are offered in evidence,*** they shall state clearly the study plan, the principles and methods underlying the study, all relevant assumptions, all variables considered in the analysis, the techniques of data collection, the techniques of estimation and testing, and the results of the study's actual estimates and tests ***presented in a format commonly accepted*** within the relevant field of expertise implicated by the study. The facts and judgments upon which conclusions are based shall be stated clearly, together with any alternative courses of action considered. Summarized descriptions of input data, tabulations of input data ***and the input data themselves shall be retained***.
>
> (f) Objections. Parties are entitled to raise objections to evidence on any proper ground during the course of the hearing and to raise an objection that an opposing party ***has not furnished unprivileged underlying documents***.

37 C.F.R. §351.10(e)-(f). (Emphasis added).

As a basic precept in royalty distribution proceedings, parties are entitled to see all documents and electronic records from which analyses are based, in order to verify bottom line numbers.  "All bottom line figures must be verified, and all parties must be prepared to share all of the underlying data that contributed to those bottom-line figures."  Order in Docket no. 94-3 CARP CD 90-92 at 2 (October 30, 1995).

## 2. THE SDC'S DISCOVERY VIOLATION, AND IPG'S MOTION TO STRIKE PORTIONS OF THE SDC WRITTEN DIRECT STATEMENT.

During the course of discovery, it became evident that the underlying data that was the basis of the SDC viewer-based study had not been produced by the SDC.  IPG initially filed a motion to compel the production of such underlying electronic data, which was granted.  (Dkt. ##91, 98).  Consequently, the SDC did produce a variety of electronic data in response to IPG's request for such underlying documents.  However, upon review of such data by IPG's expert witnesses, it was determined that certain of the electronic data had absolutely no relation to the SDC's submitted study, and significant gaps existed in the data making it impossible to replicate the results that the SDC asserted existed, i.e., no ability existed to "verify all bottom line figures".  Id.

After being confronted with such fact, the SDC conceded to IPG that the "intermediate step" that merges the produced electronic datasets in order to

generate the SDC's methodological results had not been produced by the SDC, *and did not exist*. The SDC further admitted that certain of the electronic data was unrelated to the SDC study, rationalizing that it was produced as merely "illustrative" of the type of data that might exist, i.e., a "red herring" for IPG to review.

Consequently, IPG filed a motion to strike such portions of the SDC's written direct statement as rely on the data that was not produced *and did not exist*. (Dkt. ##110, 113). The facts asserted by IPG as the basis of its motion were not challenged, however the SDC argued that it had complied with its discovery obligations by producing "all data in its possession", and that the "intermediate files" were not necessary to replicate the results of its proffered study.[4] Rather than rule on the motion on the papers, as typically occurs, the CRB scheduled an unprecedented evidentiary hearing in Washington, D.C. in order to address the matter, and requested a prehearing legal memorandum. (Dkt. #117).

IPG made its position clear in its prehearing memorandum:

> "If the Judges recognize any exception to a party's obligation to retain and produce "input data", IPG advocates that such exception be sufficiently constrained as to limit such exception to a process that was expressly revealed in discovery, and is so apparent that any calculations can be re-created with such ease as to remove any doubt

---

[4] The aforementioned facts, including the SDC's position, are correctly detailed in the CRB's Order Setting Schedule and Procedure for IPG Motion to Strike Portions of SDC Written Direct Statement. (Dkt. #117).

that the replicating party will obtain the same end result as the party describing such process."  (Dkt. #123 at p.9).

The hearing was enlightening.  SDC witness Alan Whitt testified that he is a computer programmer that *a decade prior* had performed programming services in connection with a 1999 cable royalties analysis for the Motion Picture Association of America.  Mr. Whitt did not design the analysis, nor is an expert capable of designing such an analysis, but merely handled the programming aspect of such analysis.  Mr. Whitt testified that the electronic files that were produced by the SDC in discovery were only available after he had located them on an "inoperable hard drive in his basement".  Mr. Whitt testified that he no longer had the "intermediate" files and computer codes that served to merge various datasets in his possession.  Mr. Whitt revealed on cross-examination at least three *additional* files and codes that he no longer possessed but he recalled had been used to create the results of the viewer-based study (including an algorithm, a file that prepared the Tribune data dataset, and a file that reconciled 15 minute segments in two different datasets), and confirmed his unrecorded manual "quality control process" to cull out certain programs.  Despite the wealth of missing computer files and codes that comprised the merger information, Mr. Whitt blithely asserted that any person who was "familiar with database applications" should be able to replicate his results.  All of the foregoing is memorialized in the CRB's order.  (Dkt. #147 at pp. 2-5).

22

Not surprisingly, IPG witness Dr. Laura Robinson testified that she "was not able to replicate the results ... [because] there is not enough to actually literally do the replication" in light of the missing merger information. (Dkt. #147 at p. 6, citing Dkt. #140, Tr. at 35-36, 38 (Robinson)). Nevertheless, despite this clear statement which constituted the entire rationale for IPG's motion, the CRB asserted that Dr. Robinson had conceded in her testimony *the exact opposite position*.

Specifically, to the disregard of all other testimony by Dr. Robinson embellishing on the impossibility of reconstructing the SDC's "bottom line" results in the absence of the intermediate data, the CRB cited to excerpts from Dr. Robinson's testimony that made no such concession. The first cite was to Dr. Robinson's response that she "could have" performed "a merger" of information, even though such statement was only addressing the technical possibility of *some* form of merger based on altogether unknown intermediate codes, not a merger that could approximate the results asserted by the SDC after utilizing datasets containing millions of items of information.[5] (*see* Dkt. #147 at p. 6). The second

---

[5]  The CRB's claim that Dr. Robinson conceded her ability to "merge" certain voluminous datasets is particularly disconcerting. There is no magical "merge" button on a computer. A "merger" of information in the context of the SDC viewer study referred, *at minimum*, to a computer processing file that matched data from a Tribune dataset with a Nielsen dataset, then ran computations on the matched information. The former dataset included information on hundreds of thousands of television broadcasts, each broadcast with multiple items of

cite by the CRB was to Dr. Robinson's response to two compounded questions.

The CRB treated Dr. Robinson's response as a response to the first question,

however, review of the testimony reflects that her answer was actually to the

second question posed, and was as follows:

> Q: ….[M]y only question [is] whether, if you had taken those steps
> that we just went through, whether your results would have differed
> from ... Mr. Whitt's ... ?
> A: The answer is yes.

(Dkt. #147 at p. 6, citing Dkt. #140, Tr. at 94-95 (Robinson)).

Despite Dr. Robinson's clear and extensive testimony regarding the effect of

not having the intermediate files and codes utilized to combine certain massive

---

information, e.g., time, date, station, title, genre, actors, etc., while the latter
included only ratings data only for similar but different categories, and then only for
broadcasts during limited "sweeps" periods. Information as basic as the date of the
measured Nielsen ratings does not appear in the latter dataset, and (as is now
known) can only be discerned by cross-reference to an entirely different dataset
that was not produced and reflects the actual broadcast date attributable to any day
of a particular "sweeps" period rating. Further, a "rating" is a measure of what
percentage of the community is watching a particular program, so a "1.1 rating" in
one community does not represent the same number of viewers as a "1.1 rating" in
a different community, and additional data regarding the size of a community
would have necessarily have been involved.

As such, an unlimited variety of "mergers" of information could occur, e.g.,
matching dates, matching programs, weighting ratings from different communities,
etc. However, in the absence of information as to what commands are reflected in
the computer program coding, a "merger" that replicates or approximates the
results that the SDC asserted existed would be as unlikely as winning the lottery.
*Ergo*, for the CRB to state that Dr. Robinson conceded her ability to "merge" files,
is as relevant as Dr. Robinson conceding that she could win the lottery.

electronic datasets in order to reach the results asserted by the SDC, the CRB nonetheless held that she had conceded the possibility that a merger of information approximating the SDC's asserted results could have occurred. Such was *not* Dr. Robinson's testimony. Insult on injury, the CRB then criticized that Dr. Robinson had not even attempted to "merge" the voluminous datasets. (Dkt. #147 at pp. 6-7).

The CRB then turned its attention to SDC witness Dr. Erkan Erdem who testified that he was able to "replicate" Mr. Whitt's merger of the Tribune Data and the Nielsen Data with *the same information* that was provided to IPG and Dr. Robinson in discovery. Such claim appeared questionable for the mere fact that Mr. Whitt had already testified as to numerous intermediate files and computer codes that *had not* been produced to IPG, and no longer existed. Moreover, substantive differences nonetheless existed between Dr. Erdem's results and the results that the SDC asserted exist, even as to such basic information as the television stations from which data was derived, and the programs that were accorded value. Nevertheless, examination of Dr. Erdem and his proffered results reflected that he had engaged in an imperfect "reverse engineering", and was further assisted with information and data never provided to IPG.[6] As was

---

[6]   For example, Dr. Erdem was able to make sense of certain references in the underlying Nielsen dataset by determining which dates correspond to "sweeps" weeks, thereby applying a date to viewer ratings information. As even the CRB

observed by the CRB, Dr. Erdem's results contained a reference to "channel numbers" that appeared nowhere in the underlying datasets, and appeared only in the asserted hard copy results of the supposed study, thereby reflecting that Dr. Erdem had necessarily borrowed such information from the hard copy results in order to make the two sets of results appear more similar, rather than authoring code that generated such results from the underlying datasets.  On cross-examination, Dr. Erdem admitted such condemnable fact.  (Dkt. #147 at pp. 7-8).

As noted, a predicate to the admissibility of any study in royalty distribution proceedings is that all underlying data be *retained*, and *produced*. 37 C.F.R. §351.10(e)-(f).  According to the consensus of IPG, the SDC, and the CRB, this did not occur.  Nonetheless, the SDC rationalized that its failure to comply with these rules was of no consequence because the merger of datasets to obtain the SDC-asserted results could have been easily accomplished by any person who was "familiar with database applications".  *See* supra.  Still, armed with information regarding data that had never been communicated or produced to IPG, the SDC witness could only approximate its own asserted results.

The CRB found no consequence to violation of the foregoing regulations, holding that the SDC had not shirked its discovery obligations because it had

---

acknowledged, such information was not provided to IPG, nor did the SDC provide any description that would suggest that IPG should seek out such information in order to understand the Nielsen dataset.  (Dkt. #147 at p.8).

produced all the materials in its possession (even though it had not),[7] and holding

that such materials were sufficient to allow IPG to "test" the processes used by the

SDC "expert".[8]  Such conclusions were clearly at odds with the evidence before

the CRB, as even the CRB order identified the significant number of intermediate

files that had not been produced to IPG.  Further, the CRB order was significantly

premised on misattribution to Dr. Robinson of testimony that she could have

engaged in some type of information merger sufficient to approximate the SDC

results.[9]

      Notwithstanding, the CRB ruled that it was only ruling on the issue of

whether the SDC had engaged in a discovery violation.  Whether the SDC viewer

study would be considered inadmissible at the hearing on the merits, the CRB

characterized IPG's motion as a premature motion *in limine,* and expressly

---

[7]  As to the issue of whether the intermediate data was capable of being obtained
from the MPAA, despite the SDC's representation to IPG and the CRB that it had
*never even attempted* to inquire whether such information was with the MPAA,
and despite the SDC's affirmative obligation to have retained the intermediate files
and codes, the CRB nevertheless held that it was *IPG's* obligation to prove that the
SDC had the ability to obtain the intermediate files from the MPAA and had failed
to do so.  (Dkt. #147 at p.9).

[8]  To clarify, SDC witness Alan Whitt is not, nor ever has been, an "expert" on the
design of studies.  He is a computer programmer who was directed to manipulate
data provided to him in a particular manner by other MPAA personnel who had
designed a 1999 cable royalties analysis.

[9]  The CRB repeats this misattribution in its brief explanation of the May 2, 2014
order in its final distribution order.  (Dkt. #194 at pp. 4-5).

reserved any ruling as to whether the electronic files admitted at the discovery

hearing could be admitted at the hearing on the merits.[10]

### 3. IPG'S MOTION IN LIMINE.

Per the direction of the CRB, IPG again raised the issue of the missing

intermediate data in a motion *in limine* presented prior to the final distribution

hearing. (Dkt. #178). With certain key specifics omitted, the final distribution

order recites IPG's observations and arguments regarding the still-missing

intermediate data, and other information required to be produced as a prerequisite

for admission of any study or analysis. (Dkt. #194 at pp. 5-9).

To be clear, IPG's motion argued that (i) the intermediate data that "merges"

datasets containing millions of items of information was not *retained* and *produced*

by the SDC and, even if the untimely produced "reverse engineered" process

followed by Dr. Erdem months after the close of discovery could be considered a

substitute, which it cannot, then the SDC nonetheless failed to produce any

---

[10]  Why the CRB deferred any ruling was unclear. The deadline for discovery had
passed months prior, and the intermediate data constructed by Dr. Erdem for use
at the discovery hearing had not been produced in discovery *at all*, and therefore
was not subject to the "follow-up discovery" allowed upon electronic files and
documents produced following the initial round of discovery. (*See, e.g*., Dkt. #78
at p.3, setting follow-up discovery production deadline as January 13, 2014).
Consequently, according to the rules of admissibility generally observed in royalty
distribution proceedings, the failure of the SDC to have timely produced Dr.
Erdem's intermediate data could not be revived as though it had fictitiously been
produced in discovery.

information relating to (ii) the sampling processes that were followed for the selection of stations included as part of the analysis, or (iii) to the methodological processes followed by Nielsen in the creation of the Nielsen data that was produced.  (Dkt. #194 at p.6).

As an initial matter, the CRB dismissed IPG's arguments as a "rehash" of discovery issues, i.e., the very issues that it ruled should instead be addressed as part of a motion *in limine* instead of a discovery issues motion.  Nonetheless, the CRB was forced to address that the SDC had still failed to provide significant information or electronic data detailed in Rule 351.10(e), that the SDC even admitted its failure to produce such information, or even know why certain information was selected for use as part of the SDC viewer study.

Specifically, the SDC viewer study utilized the data of only 72 television stations out of a possible 700 stations, with no known or discernible explanation as to why such stations were selected, i.e., was it a random sample, was it based on market, distant cable subscribers, etc.  The CRB noted that SDC witness Alan Whitt testified that such stations were selected by MPAA employee Marsha Kessler, but even if so, from prior proceedings Ms. Kessler is a self-acknowledged *non-expert* on sampling processes and did not appear in these proceedings.[11]  In

---

[11]   The CRB asserts that IPG "assumed" that stations referred to by Mr. Whitt were the same stations selected by Ms. Kessler as part of a 1999 analysis for Phase I, and then analyzed the lists to demonstrate that they did not correspond.  (Dkt.

fact, while the CRB cite to the testimony of Mr. Whitt that the results found on his inoperable hard drive were simply derived from the stations appearing in the underlying Nielsen data (Dkt. 194 at p.8), IPG proved the contrary, i.e., that stations containing devotional programming and appearing in the Nielsen data were not utilized as part of the SDC's presented results, again without explanation. (Dkt. #189 at pp. 28-29; IPG PFF and cites therein).

The SDC and CRB acknowledge that no one knows why the station data appearing in the SDC viewer study was selected. (Dkt. 194 at p.8). This is no small matter, as sample station selection has been historically one of the main issues of contention in royalty distribution proceedings. It is not enough for the SDC and CRB to rationalize that no "known" bias exists in the data if the reason for station selection remains unknown. (Dkt. #194 at pp. 8, 26-27).

Ironically, the CRB rationalized the denial of information to IPG by asserting that Mr. Whitt informed IPG at the discovery issues hearing of missing intermediate data (which was never subsequently produced), and that IPG had ample opportunity to cross-examine Mr. Whitt *at the final distribution hearing*.

---

#194 at p.8). On the contrary, IPG "assumed" nothing. In response to a discovery request on the issue, the SDC produced a list of stations appearing directly from the written testimony of Ms. Kessler in the Phase I proceedings because it was the SDC that "assumed" (without checking) that the lists would correspond, and intended to utilize Ms. Kessler's designated testimony as the basis for station selection in the Phase I proceeding in the instant proceeding.

(Dkt. #194 at p. 9). Such conclusion wholly disregards the evident purpose of Rule 351.10(e) and (f), i.e., to provide the recipient party an opportunity to obtain complex electronic data and documents in discovery, well in advance of the distribution hearing, in order to prepare cross-examination for the final distribution hearing. In the instant case, the SDC viewer study results lacked significant portions of the intermediate data, and the results were purportedly drawn from an undescribed or untimely described "merge" of datasets containing millions of items of information, and then without explanation as to how or why such data was selected for inclusion as part of the SDC viewer study. IPG has no means to intuit such processes, nor can such processes be deduced simply by seeing a column containing numbers alongside particular broadcasts. Without qualification, the SDC's failure to produce such information significantly prejudiced IPG, and its ability to analyze (review, replicate, test) the SDC viewer study results.

Simple review of §351.10(e) of the regulations reveals the SDC's evident failure to comply, and subpart (f) dictates that the SDC's failure to produce such information relating to its primary piece of evidence *required* exclusion of such evidence. Both at the "discovery issues" hearing and motion *in limine* hearing, the failure of the CRB to administer the regulations and exclude the SDC viewership study was an abuse of discretion, arbitrary and capricious.

31

## C. THE CRB TRANSGRESSED UNEQUIVOCAL STATUTORY COMMANDS BY ADOPTING THE PURPORTED CONCLUSIONS OF A VIEWER-BASED STUDY.

Literally decades of evolving precedent was shunned by the CRB after its reliance of the SDC's viewer based model, precedent that culminated in a 2004 decision holding that viewer based models for the distribution of retransmission royalties "measured the wrong thing", and cannot be relied on for retransmission royalty allocations.  Such "bright line" rule rejecting viewer-based methodologies was the context in which IPG developed its proposed methodology for the distribution of 1999 cable retransmission royalties, a rule altogether disregarded by the CRB in order to substitute its own expert-rejected opinion regarding what factors should now be considered relevant for allocation.[12]

In prior proceedings, the measurement of viewer ratings, i.e., viewer based methodologies, was found *irrelevant*.  Specifically, in the Phase I portion of these very 1998-1999 cable proceedings (concluded in 2004), the Librarian adopted in full the determinations of the CARP, holding:

> "The devaluation of the Nielsen study is a result of the Panel's consideration of the hypothetical marketplace . . . . [E]vidence that demonstrated how cable operators valued each program category was,

---

[12]   In fact, the CRB goes so far as to identify what methodology it would have opted to adopt (the "Shapley valuation").  (Dkt. #194 at pp.14-16).  While interesting, it is a theoretical model that to the knowledge of IPG is without any corresponding data in the field of retransmission royalties, nor even capable of data development.

> in the Panel's view, the best evidence of marketplace value . . . . The Nielsen study was not useful *because it measured the wrong thing*."

69 Fed.Reg. 3606, 3613 (Jan. 26, 2004), Docket No. 2001-8 CARP CD 98-99 (emphasis added).

In proceedings before CRB-predecessors CRT and CARP, and in subsequent CRB proceedings, it was affirmed that household viewing is not the measure of value. Rather, that the "buyers" that are to be considered for purposes of cable royalty attribution of value are the CSOs that select which broadcast stations are to be retransmitted on their cable system, not the at-home viewers.[13] While seemingly adopting that CSOs are the "hypothetical buyers" to be considered (Dkt. #194 at pp. 12-13), and that to a CSO viewer ratings might be only one of several considerations going toward the ultimate value of the retransmitted programming (i.e., marginal subscriber revenue for the CSO; Id. at pp. 13-14), the CRB nevertheless adopts the ostensible results of the SDC viewer study, which *only* looks at viewership in order to accord value. Consequently, even by the CRB's own logic, it has supplanted the CSO as the "hypothetical buyer" and replaced it with the "at home viewer", in direct contravention of multiple prior rulings which the CRB is statutorily required to follow.

---

[13]   *See* 75 Fed. Reg. 57063, 57066, 57069, 57070 (Sept. 17, 2010), Docket No. 2007-3 CRB CD 2004-2005.

Title 17 U.S.C. § 803(a)(1), mandates that the CRB was *statutorily* obliged to follow the precedent set by the CRT and CARP.  Although the CRB acknowledges this fact in the final distribution order (Dkt. 194 at p.11), the CRB ignored the ruling in Phase I of these 1998-1999 cable proceedings, and *still* adopted the purported results of a viewer based methodology.  Prior panels had already determined that the viewer ratings were not relevant, and do not equate with cable system subscribership or other net revenue considerations of a CSO.  No evidence was presented for the predicate upon which the SDC viewer study relied, i.e., that a purely viewer based study is sufficient to accord value, and prior attempts to draw such connection have repeatedly been rejected in Phase I proceedings.  *See, e.g*., 57 Fed. Reg. 15286, 15302-15304 (April 27, 1992), Docket No. CRT 91-2-89CD.

In prior rulings, the CRB has ignored the 2004 ruling because it was a Phase I ruling (*Distribution of the 2000-2003 Cable Royalty Funds,* 78 Fed. Reg. 64984, fn. 8 (Oct. 30, 2013)), all the while asserting elsewhere that the Phase I and Phase II distinction is an artificial construct.  Consistent with the latter position of the CRB, the most recently announced proceedings to be commenced are now abandoning the separation of Phase I/Phase II, and handling all distribution proceedings at the same time.  *See* Notice of Participant Groups, Commencement

34

of Voluntary Negotiation Period (Allocation), and Scheduling Order, Consolidated

Proceeding No. 14-CRB-0010-CD (2010-13)(issued Nov. 25, 2015).

When the CRT initially oversaw cable royalty proceedings, there was no

Phase I/Phase II segregation of process (i.e., all claims were addressed

simultaneously), and certainly no suggestion that certain factors affect value to

major programming categories, but not the value of programming within such

categories. Rather, the Phase I/Phase II division developed informally in order to

make the cable royalty proceedings more manageable.[14]

No rational basis exists for determining that a particular factor, e.g.,

viewership ratings, is *irrelevant* for the determination of value into larger

categories, but suddenly *relevant* when looking at the value to be attributed to

programs appearing in one of those larger categories. As has been determined by

multiple prior panels, the "value" to be determined in cable royalty proceedings is

the value as determined by the CSO whom elects to retransmit a broadcast signal.

Viewer ratings were found to "measure the wrong thing" precisely because of the

proven attenuated connection between viewer ratings and CSO decisionmaking.

While viewer ratings might be a valuable tool for discerning the advertising value

---

[14]  As noted by the CRB, "[N]either the Act not the Rules requires bifurcation of a
distribution proceeding." *Notice of Participants, Notice of Consolidation, and
Order for Preliminary Action to Address Categories of Claims*, Docket #14-CRB-
0010-CD, and Docket #14-CRB-0010-CD (Sept. 9, 2015).

of a program *to a terrestrial broadcaster*, the factors affecting a *CSO's* decision to *retransmit* a terrestrial broadcast are very different and intended to seek and retain subscribership in order to attain higher subscribership revenue.  All of the foregoing determinations were made in 2004 after the CRB's consideration of a score of witnesses (69 Fed.Reg. 3606, 3613 (Jan. 26, 2004)), all of which determinations were disregarded by this CRB.

The significance of the CRB's decision to ignore precedent cannot be overstated.  Because there is an obligation for the CRB to follow its prior rulings, parties such as IPG do not secure or solicit the testimony of witnesses to establish the same factual contentions as have already been accepted in prior determinations. Consequently, viewing a party's case in a void, without acknowledging the evidence and determinations already considered and ruled upon in countless proceedings, a party's case cannot establish (and might not even address) the issues already addressed and ruled upon in prior distribution hearings.  Such is what occurred in this proceeding when the CRB ignored prior rulings establishing that viewership based methodologies are without value because they "measured the wrong thing."

The CRB's determination to adopt the purported results of a viewership-based methodology transgressed an unequivocal statutory command that the CRB must follow the precedent of the CRT, CARP, Copyright Office and Librarian.

Prior rulings finding that viewership ratings are irrelevant to the determination of value in cable royalty proceedings could not be logically ignored, but that is precisely what the CRB chose to do, thereby rejecting the wealth of evidence from prior proceedings that generated such rulings, and injecting confusion into the cable royalty proceedings.  As a matter of law, a viewership-based methodology could not have been adopted and, even if it could, should not have been adopted due to the dearth of evidence presented to establish any connection between viewer ratings and a CSO's decision to retransmit a terrestrial station.

### D. THE CRB TRANSGRESSED UNEQUIVOCAL STATUTORY COMMANDS BY ADOPTING THE PURPORTED CONCLUSIONS OF A STUDY THAT HAD AN INADEQUATE NUMBER OF SAMPLED STATIONS.

Prior distribution proceedings have been very clear about the number of stations that must be sampled in any analysis in order for such sample to be deemed statistically sufficient, based on prior economics expert testimony.

IPG identified one of several rulings on the issue in its proposed findings of fact, demonstrating the SDC's failure to comply with the bright-line rule.  (*See* Dkt. #189 at pp. 28-30, 50).  Despite acknowledging the validity of IPG's argument, the CRB nevertheless went to great lengths to rationalize use of the purported results of the SDC study, relying on the rationalizations of two SDC witnesses that are *not* statistical experts.  (*See* Dkt. #194 at pp. 24-27).

37

**E. THE CRB ERRED IN ITS APPRAISAL OF THE IPG DISTRIBUTION METHODOLOGY BY MISSTATING IPG'S EVIDENCE AND ITS SIGNIFICANCE, MISSTATING DR. ROBINSON'S STUDY DESIGN, AND APPLYING UNSUBSTANTIATED CRITICISMS NOT SIMILARLY APPLIED TO THE SDC METHODOLOGY.**

### 1. DESCRIPTION OF THE IPG METHODOLOGY.

At pages 32-41 of its final distribution order, the CRB assess the methodology proposed by Dr. Laura Robinson. To state succinctly, Dr. Robinson compared IPG and SDC claimed programming along a variety of metrics appearing in data originated by Cable Data Corporation ("CDC"), Tribune Media Services ("Tribune"), and Nielsen Media Research. Such metrics were the volume of retransmitted programming, the time of day of such retransmitted programming (e.g., 8:00 pm versus 2:00 am), the fees paid by CSOs attributable to retransmission of the IPG/SDC claimed programming, and the number of distant subscribers to CSOs retransmitting IPG/SDC claimed programming.

As was even noted by the CRB:

> "Dr. Robinson stressed repeatedly that the Judges *should not consider the above measures of value individually*. Rather, she testified that the Judges should consider the several approaches as a whole, with any weakness in one approach offset by the other approaches that do not suffer from that weakness. Dr. Robinson also testified that this approach was an important method of analysis because her multiple valuation methods all tended toward a similar result—approximately a 50:50 distribution—despite any weaknesses or limitations in any one method."

(Dkt. #194 at p.34) (Emphasis added).

Briefing limitations preclude an extensive description, however pages 8-20 of IPG's proposed findings of fact recite IPG's methodology in great detail, with cites to the record.  Specifically, IPG details its acquisition of data for 200 television stations carried by 2,700 CSOs, the data available therefrom, the reason for acquisition of such data (including compliance with prior rulings regarding the required sample size), and the culling of such data to commercial broadcasts (i.e., excluding public station broadcasts, a different Phase I category).  (Dkt. #189 at 8-20).

In some manner or another, the CDC and Tribune data utilized by Dr. Robinson has been utilized in *every* cable royalty distribution proceeding, *for decades*.  In addition to CDC and Tribune data, IPG obtained two forms of Nielsen data -- Nielsen data produced in the 1997 cable proceedings (Phase II), reflecting distant viewing projections during 1997, and the Nielsen Television Audience Report, 2010 and 2011.  (Dkt. #189 at 8-11; Dkt. #190 at 977, 984-985 (Galaz); Dkt. #80 at 20, 22 (Robinson)).  Dr. Robinson utilized the Nielsen data for the discrete purpose of identifying daypart viewing, i.e., what percentage of aggregate daily viewers are tuning in at 8:00 pm versus 2:00 am, *not* viewing attributable to a particular program.

In sum, over 1.5 Million logged broadcasts were analyzed, each containing seventeen items of information.  (Dkt. #189 at 12; Dkt. #190 at p. 981 (Galaz)).  The commercial stations selected by IPG *alone* accounted for at least 70% of the aggregate fees paid by *all* CSOs during 1999.  (Dkt. #80 at p.26, fn. 12; Dkt. #190 at pp. 153-159 (Robinson)).   No figure was available as to what percentage the stations represented of the aggregate fees paid for only commercial station retransmission (non-commercial stations were not relevant to these proceedings), which would have necessarily been a significantly larger percentage.  (Dkt. #190 at pp. 987-991 (Galaz)).

As both IPG and Dr. Robinson testified, IPG gave no instructions to Dr. Robinson other than to review the prior opinions of the CRB and its predecessors, and to devise a methodology that adequately allocated "relative market value" to the IPG/SDC programming.  (Dkt. #190 at p.109 (Robinson), pp. 987, 997-998 (Galaz)).

According to Dr. Robinson, analysis of the market value of retransmitted broadcasts benefits from an examination of a hypothetical negotiation between a willing buyer (a CSO) and a willing seller (copyright owner).  The economic theory of bargaining indicates that it is necessary to consider marginal costs and benefits to the parties.  (Dkt. #80 at 16).  Dr. Robinson, nor any party, has information regarding the marginal benefits and marginal costs faced by the CSOs

retransmitting the broadcasts at issue in these proceedings. However, various indicia of the economic value of the retransmitted broadcasts *to the CSOs* exist in obtainable data, including the length of the retransmitted broadcasts, the time of day of the retransmitted broadcast, the number of persons distantly subscribing the station broadcasting the claimed programs, and the fees paid by CSOs to retransmit the stations carrying the broadcasts. (Dkt. #80 at 17). That is, such indicia reflect the *CSO* decisionmaking that is being analyzed.

### 2. THE IPG METHODOLOGY RESULTS ACCORDING TO THE MEASURED METRICS

Following the exchange of discovery materials and the Order of June 18, 2014, Dr. Robinson identified 17,725 compensable IPG/SDC broadcasts (11,041 IPG broadcasts; 6,684 SDC broadcasts) within IPG's data. (Dkt. #189 at p.12). Dr. Robinson thereafter compared the IPG and SDC broadcasts according to the metrics set forth above. (Dkt. #189 at pp. 13-20). Although the CRB omitted to mention certain key facts relating to Dr. Robinson's metrics, for purposes herein, the description of Dr. Robinson's methodology and results set forth in the final distribution order can be considered. (Dkt. #194 at pp. 32-37).

As noted therein, Dr. Robinson concluded that on virtually every criteria of comparison, there was no significant difference between the IPG and SDC retransmitted broadcasts.

### 3.  CRB CRITICISMS OF THE IPG METHODOLOGY.

#### a. DR. ROBINSON'S ALLEGEDLY INACCURATE PRESUMPTION REGARDING THE MARKET TO MEASURE.

According to the CRB, Dr. Robinson's design erred because it "presume[s] the existence of the compulsion arising from the pre-bundled status of the retransmitted programs as it existed in the *actual* compulsory-license market, rather than the compulsion-free *hypothetical* fair market consistently applied by the Judges".  (Dkt. #194 at p. 37).  The basis for such criticism emanates, however, from a CRB misunderstanding.

By way of background, the compulsory license regime requires CSOs to license a station's signal in its entirety, 17 U.S.C. § 111(d)(1)(B), and to retransmit the programs (including advertisements) without alteration. 17 U.S.C. § 111(c)(3). Nevertheless, while acknowledging that the Copyright Act (Act) does not mandate (or even suggest) a formula for royalty distribution (Dkt. 194 at p.10), the CRB explain their charge to be to value individual programming in a "hypothetical" market "free of the compulsion that arises from the pre-bundling that exists in the actual market."

No precedent was cited by the CRB, nor exists, for this monumental statement.  For all practical purposes, such determination would make largely irrelevant the data compiled by Cable Data Corporation that measures the "actual"

market, has been consistently relied on in each royalty distribution proceedings *for decades*, is referenced in likely every reported decision *for decades*, has been regularly endorsed by the CRB and its predecessors, and compiles information on the retransmission of programming by CSOs that are necessarily subject to the "bundling" requirement of 17 U.S.C. § 111(c)(3).  That is, taken to its logical end, criticizing the use of information measuring the "actual" market as irrelevant or misplaced means rejecting scores of decisions relying on such data.

Moreover, a logical misstep exists.  The CRB argument for desiring only information from the "hypothetical" market is to reconstruct a market in which the buyer (i.e., the CSO), is under no compulsion to purchase.  According to the CRB, the "bundling" requirement of 17 U.S.C. § 111(c)(3) compels the CSO to purchase "all or nothing".  However, such assertion ignores that a CSO is never required to retransmit a distant television signal.  Rather, it is always a choice made by the CSO.  While the ability to retransmit is subject to "bundling", under no circumstances is the CSO *compelled* to carry the signal.  That is, the CSO has made a decision to carry the entirety of the signal, which renders data reflecting the actual retransmission market relevant, and the criticism of Dr. Robinson's use of such data misplaced.

### b.  DR. ROBINSON'S ALLEGED "INDIRECT" RELIANCE ON VIEWERSHIP.

The CRB criticizes that the Dr. Robinson's methodology implicitly uses indicia of viewership to measure program value, while eschewing viewership as a measure of program value.  According to the CRB, Dr. Robinson's measurement of program duration (i.e., volume), daypart viewing, and the number of distant cable subscribers, all serve as a shorthand for relative market value "based on their indirect contribution to viewership".  (Dkt. #194 at p.37).

Viewed in a paradigm that *presumes* increased subscribership means increased viewership, and vice-versa, the CRB's criticism would be well-placed.  However, the CRB continues to ignore that such cause and effect relationship has been firmly disproven in extensively litigated proceedings, and was the basis for the precedent in Phase I of these 1998-1999 cable proceedings wherein the CARP and Librarian found that Nielsen viewer ratings "*measured the wrong thing*."  69 Fed.Reg. 3606, 3613 (Jan. 26, 2004).

To be clear, the foregoing precedent established that the motivations of a CSO are very different than that of an over-the-air broadcaster.  A broadcasting television station can exhibit only *one* program at any given time.  By contrast, a CSO provides a *lineup* of programs, motivating the CSO to add programming that will generate the maximum additional subscribers at the lowest cost, i.e., "marginal subscriber revenue".  (Dkt. #194 at pp. 13-14).  As a matter of logic, and extensive testimony in Phase I of these proceedings, it was established that programs with

44

very low *local* viewer ratings often increase a CSO's "marginal subscriber revenue" more than a program with high *local* viewer ratings.  69 Fed.Reg. 3606, 3613 (Jan. 26, 2004).

It is therefore ironic that the CRB acknowledges that viewership does not equate to subscribership (*see, e.g.*, discussion of "duplicative" viewership), but then *presumes* the contrary and criticizes Dr. Robinson for having relied on subscribership related criteria.  (*Cf*. Dkt. #194 at pp. 13, 37).  Such criticism is hopelessly contradictory of precedent, and the CRB's own observation regarding duplicative viewership.

### c.  THE ALLEGED "STRAITJACKETING" OF DR. ROBINSON.

The CRB attempt to discredit Dr. Robinson's methodological design by asserting that she was "straitjacketed" by IPG's supply of only certain types of data, noting that it is the same type of data relied on by IPG in the 2000-2003 cable proceedings, where IPG's proposed methodology was provided by a non-expert. (Dkt. #194 at p. 38).

To be certain, Dr. Robinson did rely on the same *type* of data.  However, no other known data exists that reflects CSO decisionmaking other than what was in Dr. Robinson's possession.  The data is the *identical* type of data from the same sources as have been consistently relied on by parties in royalty distribution

proceedings *for decades* (i.e., data from CDC and Tribune Media),[15] has been

regularly endorsed by the CRB and its predecessors, and was used by Dr. Robinson

in an altogether different manner than any prior IPG-proposed methodology.  Dr.

Robinson and an IPG representative also testified that she was free to use the data

in whatever manner she considered useful, without restriction.  (Dkt. #190 at p.109

(Robinson), pp. 987, 997-998 (Galaz)).  All the foregoing facts were known, but

conspicuously omitted by the CRB in its final distribution order.  Moreover, and

convenient to the CRB's hollow criticism, no other type of data is suggested by the

CRB as what data *could* have been used by Dr. Robinson.

  Finally, it cannot be ignored that no comparable criticism was levied at the

SDC, whose study results were not presented by their designer (who remains

*unknown*), but were merely endorsed by a third party (Mr. Sanders) a decade after

their making, without any opportunity for revision or manipulation, and only after

the study results (not the complete analysis) were taken from an inoperable hard

drive found in a basement of the computer programmer.  *See* discussion, infra.  As

---

[15] As but a sampling, the following decisions reflect prior use and reliance on
CDC and/or Tribune data: *See Notice of Final Determination, 1989 Cable
Royalties,* 57 Fed. Reg. 15286, 15294 et seq. (April 27, 1992); *Distribution of
1993-1997 Cable Royalty Funds*, 66 Fed. Reg. 66433, 66447 et seq. (Dec. 26,
2001); *Distribution of the 2000-2003 Cable Royalty Funds,* 75 Fed. Reg. 26798,
26800 et seq. (May 12, 2010); *Distribution of the 2004 and 2005 Cable Royalty
Funds,* 75 Fed. Reg. 57063, 57071 et seq. (September 17, 2010).

to Mr. Sanders' credibility, his endorsement of the SDC viewer study arrived with the SDC written direct statement on December 2, 2013 (Dkt. #81), in the absence of any of the intermediate data demonstrating the processes and merger of underlying datasets to generate the SDC's ostensible results, and sixteen months prior to Dr. Erdem's ostensible replication of such intermediate data on March 28, 2014.  Such would be the definition of "straitjacketing".

### d.  DR. ROBINSON'S STATION SAMPLE.

According to the CRB, Dr. Robinson "acknowledged that the data available to her was incomplete", and acknowledged that her sample of stations was not a random sample, "[t]hus, the sample upon which Dr. Robinson relied suffered from the same infirmity as the Kessler Sample relied upon in part by the SDC."  (Dkt. #194 at pp. 34, 37).  Far from it.

Initially, the reference to Dr. Robinson's data being "incomplete" is a reference to the fact that Dr. Robinson did not obtain station data for *all* 700 retransmitted stations, i.e., a complete census.  However, such statement ignores that in the history of royalty distribution proceedings, no party (except IPG in the 2000-2003 proceedings) has *ever* sampled 200 stations as part of its analysis for a given year.[16]  By comparison to all parties, in scores of proceedings going back

---

[16]   Such fact is not reflected in the record as the CRB criticism was not raised during the proceedings, but is a representation of IPG herein.

decades, Dr. Robinson's sample was the second largest ever compiled for a given year.

As to the criticism that the station selection was not a random sample, and instead took the 200 most significantly retransmitted stations, as of the date of IPG's data acquisition no criticism had previously been made by the CRB or its predecessors that the stations were not selected by random sample - - such issue did not first arise until the 2000-2003 cable proceedings (Phase II). (Dkt. 190 at p. 982 (Galaz)). Consequently, Dr. Robinson saw no issue during the design of her analysis (and review of multiple prior rulings) to using a non-random sample intended to address the broadcasts of CSOs generating the vast majority of retransmission fees, i.e., CSOs paying over 70% of the retransmission royalty fees.

Moreover, the CRB equated Dr. Robinson's non-random sample with that of the SDC's reliance on the "Kessler Sample", despite huge differences. Whereas Dr. Robinson (an expert in economics) could articulate why she relied on the 200 most distantly retransmitted stations for her analysis, i.e., in order to address what is occurring in the vast majority of the retransmission market, the SDC viewer study utilized the data of only 72 television stations out of a possible 700 stations, ostensibly selected by an acknowledged non-expert in sampling (Marsha Kessler), with no known or discernible explanation as to why such stations were selected. The CRB's assertion that the Robinson sampling suffers from the same malady as

the Kessler Sample displays but another result-oriented criticism levied for no

apparent purpose other than to make Dr. Robinson's analysis seem unreasonable.

Notwithstanding, as an exercise to demonstrate the reasonableness of the

data, Dr. Robinson engaged in a "sensitivity analysis" in order to reflect how her

estimated values would vary *even if* broadcast data from the stations responsible

for the remaining 29% of fees were assessed wholly to IPG, or wholly to the SDC.

Such analysis shows the impact of considering the least favorable and most

favorable scenarios on the relative market value share estimates and shows that the

IPG relative market share value ranges from 37% to 66% (for multiple indicia

related to broadcasts), and 29% to 58% (for a single indicator related to CSOs), in

the extreme cases in which all missing data benefits the SDC claimants on the one

hand, or IPG on the other.  Such figures reflect a "floor" and a "ceiling" on the

relative value and award to IPG even though no evidence suggested that there

should be a presumption in one direction or the other.  (Dkt. #190 at pp. 153-158

(Robinson); Dkt. #189 at 18-19).

Dr. Robinson's reward for her economic exercise, which was openly

presented in tables in her written testimony, was for the CRB to inexplicably allege

that the 29% to 58% range of one calculation was "a fact that Dr. Robinson had

tried hard to obscure."  (Dkt. #194 at p.40).  But again, an unsubstantiated criticism

was levied for no apparent purpose other than to make Dr. Robinson's analysis seem biased.

### e. CRITICISM OF THE METRICS SELECTED BY DR. ROBINSON.

Despite Dr. Robinson's express and oft-stated position that the criteria she considered cannot be considered in isolation (Dkt. #194 at p. 34), such is *exactly* what the CRB did in their critique of her methodology, i.e., viewed and criticized her presented metrics in isolation.  (Dkt. #194 at pp. 39-41).

As noted, Dr. Robinson testified that no single metric is an isolated measure of relative market value, as a change in one metric in one direction could change another metric in another direction.  Nonetheless, the metrics selected by Dr. Robinson all reflect data on CSO decisionmaking, as opposed to home viewer decisionmaking: (i) the duration the CSO has elected to retransmit a particular program, (ii) the time of day that the CSO has elected to retransmit a particular program, (iii) the fees paid by CSOs for retransmission of the station containing the particular program, and (iv) the number of subscribers to CSOs carrying the retransmitted program.  All of these criteria are encompassed in a CSO's decision to retransmit a particular television station.

First, the CRB criticized that "volume" itself does not reflect how many subscribers have access to the programs.  (Dkt. #194 at p.39).  This observation is correct, and was first raised by Dr. Robinson, meaning that to have significance

such volume figure must be compared to the figures of fees and subscribers

attributable to the CSOs carrying such programming.  In the instant case, the near

identical split of IPG/SDC volume, while a near identical figure for each of the

fees and subscribers criteria, provided only one possibility, i.e., that the number of

subscribers receiving IPG and SDC programming are near identical.

Second, the CRB criticized Dr. Robinson's daypart viewing metric, both as

to its accuracy and its relevance.  (Dkt. #194 at p.39-40).  As to the accuracy of Dr.

Robinson's observation that no significant difference exists between the time-of-

day that IPG/SDC programs are exhibited, the CRB failed to note that *even the*

*SDC's expert witness* had observed no difference between the time of day that IPG

versus SDC programs were retransmitted.[17]  Further, while Dr. Robinson utilized

1997 daypart viewing percentages in order to compare the time of day by which

IPG/SDC programs were broadcast in 1999, the CRB ignored the Nielsen

Television Audience Report, 2010 and 2011, which found imperceptible changes

in daypart viewing *over the three prior decades* (*see* supra), thereby revealing the

reasonableness of Dr. Robinson's use of 1997 daypart viewing percentages in her

comparison of the 1999 broadcasts claimed by IPG/SDC.

---

[17]  *See* Dkt. #189, IPG PFF at pp. 14-15, *citing* SDC WDS (Dkt. #81) at pp, 7-8
(Sanders test.):  SDC witness John Sanders has testified "I concluded there was no
meaningful difference in the time of day when the subject programs were telecast."

As to the relevance of the daypart viewing metric, the CRB altogether mischaracterized the purpose for Dr. Robinson's use thereof in an attempt to make its use appear nonsensical. Suggesting that such metric was used for calculating post-facto program-by-program ratings, the CRB stated that it leads to an "absurd" result whereby "equal value [is given] to the Super Bowl and any program broadcast at the same time."[18] (Dkt. #194 at p.39).

As has been clarified in this and other proceedings, the purpose of Dr. Robinson's daypart viewing metric is to assign a value to a program based *only on what a CSO knows at the time that the program is selected for retransmission.* CSOs, no different than terrestrial broadcasters or the rest of the world, do not have a crystal ball that allows them to know in advance what the viewership will be for a particular program. CSOs' only capability of viewership prediction is based on the daypart by which a program is broadcast, i.e., programs airing at 8:00 pm typically garner more viewers than programs airing at 2:00 am, a commonly accepted concept not even challenged in the proceedings. Obviously, a distribution methodology that seeks only to consider what information a CSO relies on in order to select programming for retransmission should only utilize the information that is

---

[18]   The CRB's final determination cites to Dr. Robinson's testimony and suggests that Dr. Robinson conceded an "absurd" result. (Dkt. #194 at p.39). Such was not the case, nor does the transcript so reflect. (Dkt. #190 at p.264 (Robinson)).

available to a CSO prior to such decisionmaking, i.e., historical daypart viewing measurements, and not post-facto ratings data.

Third, and *again* viewing a metric in a void to all other information, the CRB criticized Dr. Robinson's fees paid metric which compares the fees paid by CSOs retransmitting IPG versus SDC programming.  (Dkt. #194 at p.40). The CRB's criticism:  "The use of a fee-based attempt at valuation is particularly problematic . . . for a niche area such as devotional programming, which constitutes only a small fraction of total station broadcasting."  (Dkt. #194 at p.40).

Initially, it is ironic that the CRB's criticism cites to a final determination in which Phase I distributions were made to a party based *solely* on a fees paid metric,[19] yet criticizes Dr. Robinson's use of such metric when she utilizes it as *only* one of several metrics to be considered.  (Dkt. #194 at p.40).  Moreover, in their zeal to find *any* fault with Dr. Robinson's methodology, the CRB overlooked that the prior use of a fees paid metric as the *sole* basis for allocation was for a Phase I category of *lesser size* than the devotional programming category, thereby rendering the CRB's criticism utterly unwarranted and contradictory of prior decisions.[20]  Such demonstrable fact leads to the inevitable conclusion that the

---

[19]  *See* Dkt. #194 at p.40, *citing Distribution of 1998 and 1999 Cable Royalty Funds,* 69 Fed. Reg. 3606, 3609 (January 24, 2004).

[20]  Allocation by use of a fees paid metric occurred in two proceedings in the allocation of royalties to the Canadian Claimants Group ("CCG").  In the earlier

CRB continues to apply one set of criteria to evaluate IPG-proposed methodologies, and a different set of criteria to evaluate any other methodologies that come before them.

Finally, and as a fourth instance in which the CRB ignored Dr. Robinson's predicate of considering all metrics in conjunction with each other, the CRB criticized Dr. Robinson's comparison of subscribership levels to CSOs carrying IPG versus SDC programming.  According to the CRB, "this metric is of no assistance in measuring the total number of distant subscribers even *receiving* a program, let alone the number of distant subscribers who watch the program." (Dkt. #194 at p.40.)  The basis of the criticism was the observation that "the subscribership metric can actually *increase* when a program is eliminated, if the program has been retransmitted by a cable system with lower than average number of subscribers."  Id.  Of course such is the case, but in such instance the increase in the average subscribership metric is balanced by a reduction in the corresponding volume metric, a fact that (if not already obvious) was expressly raised by Dr.

---

proceeding, the CCG was awarded 1.76% and 1.9% of the Basic Fund, while the Devotional programming category received 1.19% and 1.19%, respectively. *Distribution of 1998 and 1999 Cable Royalty Funds,* 69 Fed. Reg. 3606, 3610 (January 24, 2004).  In the latter proceeding, the allocation of royalties to the CCG was 2.0% and 2.0% of the Basic Fund, while the Devotional programming category received 3.5% and 3.5%, respectively.  *See Distribution of the 2004 and 2005 Cable Royalty Funds,* 75 Fed. Reg. 57063, 57073, 57075 (September 17, 2010).

Robinson and that the CRB seem intent on ignoring. Considering all metrics in conjunction with each other, perhaps even mathematically factoring them against each other, addresses the inane conclusions that are reached when considering metrics in isolation, the very process that Dr. Robinson cautioned should not occur.

### 4. THE CRB'S RESULT-ORIENTED DETERMINATION.

In sum, Dr. Robinson's analysis was derived from vastly greater amount of data than the SDC study, was the product of her own design as an expert in economics, and capable of being explained in the simplest of terms, i.e., that upon several measured metrics that reflect CSO decisionmaking, the IPG and SDC programming produce comparable results.

By contrast, the SDC viewer study was designed by an *unknown* designer, included an insufficient station sample selected by an acknowledged non-expert in sampling according to *unknown* criteria, which study was questionably endorsed a decade subsequent to its creation by an "expert" who at the time of his endorsement did not even have the data necessary to confirm the processes applied by the unknown designer. Further, from its inception the SDC viewer study suffered from the malady that it "measured the wrong thing" according to bright line precedent that found viewer based studies irrelevant to royalty distribution proceedings.

Subject to a wealth of issues overlooked by the CRB, the SDC viewer study found that IPG's programming garnered only 18.5% of the viewers of such programming.   That is, according to the SDC study, of 17,725 compensable broadcasts *each and every* SDC claimed broadcast garnered more than four times the viewers than *each and every* IPG claimed broadcast, despite a comparable number of broadcasts, at comparable times of the day, distributed to a comparable number of subscribers, on CSO systems paying a comparable amount of fees for the right to retransmit such broadcasts.

Review of the CRB final distribution order gives no hint of the foregoing, for the evident fact that it was result oriented.   The CRB disregarded evidence supporting application of the IPG methodology, applied a wealth of unsubstantiated criticisms against Dr. Robinson's methodology, and ignored that such criticisms (if articulated) fared dramatically worse upon the SDC methodology.

In a phrase, the CRB final distribution order was *arbitrary and capricious*.

## CONCLUSION

For the reasons set forth above, IPG respectfully requests that this Court reverse the CRB's orders of May 2, 2014, June 18, 2014, and January 14, 2015, in

the manner described herein, and remand the matter to the CRB in order for

proceedings thereon to be commenced.

                                                  Respectfully submitted,

Dated: February 19, 2016                          _____/s/_____
                                                  Brian D. Boydston, Esq.
                                                  California State Bar No. 155614

                                                  PICK & BOYDSTON, LLP
                                                  10786 Le Conte Ave.
                                                  Los Angeles, California 90024
                                                  Telephone:  (213)624-1996
                                                  Facsimile:   (213)624-9073
                                                  Email:       brianb@ix.netcom.com

                                                  Attorneys for Independent Producers
                                                  Group

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of February, 2016, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  I further certify that I will cause eight paper copies of this brief to be filed with the Court within two business days.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECG system.


_____/s/_____
Brian D. Boydston

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief complies with the type-volume limitation of Fed.
R. App. P. 32(a)(7)(B) because:

     this brief contains **11,200 words**, excluding
the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii)
.

2. This brief complies with the typeface requirements of Fed. R.
App. P. 32(a)(5) and the type style requirements of Fed. R. App.
P. 32(a)(6) because:

     this brief has been prepared in a proportionally spaced typeface
using Microsoft Word in font size 14 and Times New Roman type style.

Dated:  February 19, 2016          _____/s/_____

Brian D. Boydston, Esq.
California State Bar No. 155614

PICK & BOYDSTON, LLP
10786 Le Conte Ave.
Los Angeles, California 90024
Telephone:   (213)624-1996
Facsimile:   (213)624-9073
Email:       brianb@ix.netcom.com

Attorneys for Independent Producers
Group